[Cite as *State v. Belcher*, 2014-Ohio-5596.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

       Appellee

v.

Timothy Belcher

       Appellant

Court of Appeals No.   L-13-1250
                        L-13-1252

Trial Court No. CR0201301186

**DECISION AND JUDGMENT**

Decided:  December 19, 2014

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
David F. Cooper, Assistant Prosecuting Attorney, for appellee.

Tim A. Dugan, for appellant.

* * * * *

**JENSEN, J.**

{¶ 1} Following a jury trial, defendant-appellant, Timothy Belcher, appeals from
the October 11, 2013 judgment of the Lucas County Court of Common Pleas sentencing
him following his convictions of aggravated burglary, aggravated robbery, robbery,

felonious assault, and grand theft of a motor vehicle. Because we find Belcher's fourth assignment of error well-taken, in part, and his sixth assignment of error well-taken, we reverse and remand this matter to the trial court for proceedings consistent with this decision.

## I. Background

{¶ 2} On the afternoon of December 27, 2012, Travis Lowell, Brandon Allen, and Jeff Prentice were playing football in the street near the intersection of Burnham Green and Danesmoor Roads in Lucas County, Ohio. A man, who Lowell recalls was wearing white Adidas shoes with black stripes, walked by and said "hey, what's up." About a minute-and-a-half later, they heard commotion coming from the nearby home of Dale Nicholas.

{¶ 3} Nicholas was in his house when he saw a man walk by his window toward his attached garage, which he had left open. He went outside to find that the man was in his truck. Nicholas—who had never seen the man before this incident—confronted him, asked what he was doing in his garage, and opened the truck door, grabbing him. Using the keys that Nicholas left in the cupholder inside the truck, the man started the truck. He accelerated forward and struck the garage with enough force to knock it off the foundation. With Nicholas standing on the truck's running board, the man then put the truck in reverse, striking Nicholas' wife's car in the process. Nicholas jumped from the running board into a snow mound as the man escaped in the truck. The truck was

2.

recovered the next day about a quarter of a mile from Nicholas' home, across the street from an apartment complex. It had sustained approximately $7,000 in damage.

{¶ 4} On December 28, 2012, Nicholas received a phone call from someone who told him that it was Belcher who had stolen the vehicle. Nicholas provided this information to the sheriff's department, but refused to identify the caller who had apparently told Nicholas that he or she feared retaliation from the Belchers. A detective from the sheriff's office discovered that Belcher had outstanding arrest warrants, and several deputies went to his apartment to arrest him. Belcher lived in the apartment complex across the street from where the truck was found.

{¶ 5} Either on Belcher's feet or somewhere near Belcher—the testimony on this point was conflicting—were white Adidas tennis shoes with black stripes, like those described by Lowell. A photo array was assembled and shown to the young men who were playing football in the street. Lowell and Allen identified Belcher as the man they had seen walk by just before Nicholas' truck was stolen. Prentice was unable to identify the suspect in the photo array. Belcher was charged with aggravated burglary, under R.C. 2911.11(A)(2), aggravated robbery, under R.C. 2911.01(A)(1), robbery, under R.C. 2911.02(A)(2), felonious assault, under R.C. 2903.11(A)(2), and grand theft of a motor vehicle, under R.C. 2913.02(A)(1) & (B)(5).

{¶ 6} After two unsuccessful motions to suppress evidence, the matter proceeded to a jury trial on September 23, 2013. The jury found Belcher guilty of all charges. In a

3.

judgment entry dated October 11, 2013, the trial court sentenced Belcher to an aggregate prison term of 17 years.  Belcher filed this timely appeal and assigns the following errors for our review:

1)  The Trial Court erred in not suppressing the fruits of an illegal search.

2)  The Trial Court erred in not suppressing witness identifications based on an unduly suggestive photo array.

3)  The Trial Court erred by not compelling the victim to disclose the name of the person who accused Appellant of stealing the victim's vehicle.

4)  The State of Ohio failed to produce legally sufficient evidence to sustain convictions for Aggravated Robbery, Aggravated Burglary, and Felonious Assault.

5)  Appellant's conviction fell against the manifest weight of the evidence.

6)  The Trial Court erred in not merging Appellant's Felonious Assault convictions into both the Aggravated Robbery and Aggravated Burglary convictions as allied offenses.

7)  The Trial Court erred by not making the statutory findings required for consecutive sentences.

## II. Law and Analysis

### A. Motions to Suppress

{¶ 7} In his first and second assignments of error, Belcher challenges the trial court's denial of his motions to suppress, arguing (1) that his shoes were unlawfully seized; and (2) that the photo array shown to the witnesses was unduly suggestive.

{¶ 8} Appellate review of a motion to suppress is a mixed question of law and fact. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. On a motion to suppress, the trial court assumes the role of finder of fact and, as such, is in the best position to determine witness credibility and to resolve factual disputes. *State v. Codeluppi,* 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 7, citing *State v. Mills,* 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). On appeal, we must accept the trial court's factual findings as true if supported by competent and credible evidence. *State v. Durnwald,* 163 Ohio App.3d 361, 2005-Ohio-4867, 837 N.E.2d 1234, ¶ 28 (6th Dist.). We then independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard. *State v. Jones–Bateman,* 6th Dist. Wood No. WD-11-074, 2013-Ohio-4739, ¶ 9, citing *State v. Claytor,* 85 Ohio App.3d 623, 626, 620 N.E.2d 906 (4th Dist.1993).

### 1. Seizure of the Shoes

{¶ 9} Detectives Jeffrey Kozak and Patrick LaPlante, Sheriff's Deputy Richard Strong, and Sergeant Richard Ellis, of the Lucas County Sheriff's office, went to Belcher's apartment to serve outstanding arrest warrants. While there, they seized a pair

5.

of white Adidas tennis shoes with black stripes—shoes identified by Lowell as having been worn by the man who walked by them the afternoon of the incident. The trial court, in a decision announced immediately following the suppression hearing, found that the officers were there lawfully to execute the arrest warrant, that the Adidas shoes "were in plain view in the area not more than 10 feet from the door when the defendant was arrested," and that they fit the description of the shoes described by the witnesses who saw the suspect, thus they were properly seized. Belcher claims that because of discrepancies in the testimony of the officers, the court's findings of fact were not supported by competent, credible evidence.

{¶ 10} To seize evidence pursuant to the plain view exception to the warrant requirement, officers must have a legal right to be in the area where they observed the evidence in plain view, the officers must have probable cause to associate the evidence with a crime, and the police must have a lawful right of access to the evidence itself. *State v. Luipold*, 6th Dist. Erie No. E-99-037, 2000 WL 1132781, *8 (Aug. 11, 2000).

{¶ 11} The officers who testified at hearings on Belcher's motions to suppress clearly had differing recollections of the details of Belcher's arrest and the discovery of the shoes. Strong, who assisted in serving the arrest warrant at the request of his supervisor, testified that he did not know the name of the person they arrested, although he was able to identify Belcher visually in court. His recollection was that they forced entry into the apartment and that Belcher was not cooperative. He said they conducted a protective sweep of the apartment, searched the apartment for drugs and weapons, and

6.

that there were perhaps drugs found on the table. He did not believe that Belcher had shoes on and he could not remember the brand name of the shoes they seized. He conceded, however, that he did not recall much of anything about serving the arrest warrant.

{¶ 12} Ellis testified that he and Strong initially secured the perimeter of the apartment to make sure no one escaped through other doors or windows. He said they entered the apartment after it had been cleared. He did not know if entry was forced and did not know where the shoes were when they were seized. He recalled that Belcher was handcuffed and seated on the couch by the time he went up to the apartment.

{¶ 13} Kozak—the lead investigator on the case— testified that Belcher was cooperative and entry was not forced. He said that Strong's testimony to the contrary was incorrect. He observed that Belcher was wearing shoes like the ones described by Lowell, which he said he was pleased to see. He explained that they had Belcher remove the shoes and he photographed them. He believed that a second pair of shoes that were photographed were shoes that were found nearby that they gave to Belcher to wear as they transported him to the jail. He identified that Belcher was wearing the other pair of shoes during the hearing. He denied that they went through the closets or opened boxes to find the Adidas shoes and he denied that drugs were found.

{¶ 14} LaPlante also testified that entry was not forced and that Belcher was cooperative. After being handcuffed, Belcher stood within ten feet of the doorway. LaPlante did not recall if Belcher had the shoes on initially but he said that the Adidas

shoes were on Belcher's feet at some point while they were there to make the arrest. Kozak whispered to him that they were the same shoes described by Lowell. He suggested that Kozak photograph them. He did not recall Belcher wearing the other pair of shoes that were photographed. LaPlante also confirmed that they did not do a search of the apartment at that time—just a protective sweep to determine if there were others in the home. He recalled that Strong assisted in the protective sweep. He agreed that they could have obtained a search warrant, but he denied that they were looking in closets or that the shoes were taken from a closet.

{¶ 15} Although the officers' recollection of the events varied somewhat, the trial court took this into account in rendering its decision. It recognized that "witnesses recollect situations differently, and it doesn't mean their testimony is inaccurate. It just means their recollection is different." The court noted that Kozak recalled the shoes being on Belcher's feet upon arrival, whereas LaPlante recalled that he put them on later. Nevertheless, it explained, "what is clear is that the shoes in question, the Adidas shoes in Exhibit 1, were in plain view in the area not more than 10 feet from the door when the defendant was arrested." After reviewing the testimony and exhibits, we cannot say that there was not competent, credible evidence to support that conclusion.

## 2. The Photo Array

{¶ 16} With respect to the photo array, Belcher claims that his most recent booking photo was inexplicably not used in the array and that the shadowing in his photo improperly emphasized his picture over the other five booking photos in the array. He

8.

argues that this resulted in an unduly suggestive array, therefore requiring the court to consider additional factors in determining whether the identifications were nevertheless reliable.

{¶ 17} "Photo array evidence is suppressed only if the identification, or method of identification, is unduly suggestive and unreliable." (Internal citations omitted.) *State v. Heflin*, 6th Dist. Lucas No. L-10-1268, 2011-Ohio-4134, ¶ 17. The burden is on the defendant to show that the identification procedure was unduly suggestive. *Id.,* citing *State v. Harris,* 2d Dist. Montgomery No. 19796, 2004-Ohio-3570, ¶ 19. If it was not unduly suggestive, "any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required." *Id.,* citing *State v. Wills*, 120 Ohio App.3d 320, 325, 697 N.E.2d 1072 (8th Dist.1997).

{¶ 18} At the suppression hearing, Kozak and LaPlante described the procedure for assembling the photo array, as well as the procedure for presenting that array to the three men who were playing football in the street the afternoon of the incident. Kozak described that he entered certain parameters into the computer system including race, height, weight, hair color, eye color, age range, and whether the suspect had facial hair or wears glasses, and the system returned booking photos of individuals whose physical appearance was consistent with those parameters. In this case he searched the system for white men with brown hair and brown eyes, between 5'9" and 5'11" tall, 38-42 years of age, weighing between 155 to 175 pounds.

9.

{¶ 19} Of the various photos matching those parameters, Kozak selected five and placed each photo in its own manila folder. He used a booking photo of Belcher dated July 26, 2012, and placed it in its own folder as well, and he included four blank folders. LaPlante, who administered the array, then allowed the witnesses to view the folders outside the presence of each other and to indicate whether the suspect's photo was among those provided. He made no signals to suggest to the witnesses which photo to select. Lowell and Allen identified Belcher's photo and both testified at the hearing that they were confident in their identification. Prentice was unable to identify the suspect.

{¶ 20} Belcher has identified no flaw in the procedure used in presenting the array to the witnesses. He claims, however, that the lighting in his photo was such that a shadow was cast to the left side of his picture—Kozak conceded as much on cross-examination. Belcher argues that this caused his photo to jump out, communicating to witnesses that they should choose his photo. But there was a shadow cast in the second photo in the array as well, thus Belcher's photo did not unfairly stand out. We also note that the first photo in the array contains a close-up photo which could just as easily be argued caused *that* photo to stand out over all the others.[1] We are not persuaded that the array was unduly suggestive due to the shadow. Also, because the booking photo was only six months old, we find no error in using that photo.

---

[1] It should be noted, however, that in a case in which a defendant claimed that his photo was substantially larger than the others, we concluded that the array was not unduly suggestive. *See State v. Johnson,* 6th Dist. Lucas No. L-13-1032, 2014-Ohio-4339, ¶ 14.

10.

**{¶ 21}** We find Belcher's first and second assignments of error not well-taken.

## B. Right to Confront Witnesses

**{¶ 22}** On cross-examination at trial, defense counsel questioned Nicholas about the phone call he received informing him that Belcher was the person who stole his truck. Nicholas acknowledged that he contacted Kozak to pass along the information. Although Nicholas initially characterized the caller as "anonymous," he conceded that he knew the identity of the caller but would not reveal it because the caller knew the Belcher family and did not want to be involved. Nicholas attempted to avoid identifying the caller by asserting the Fifth Amendment right against self-incrimination. A lengthy in-chambers discussion ensued during which defense counsel sought to persuade the court to compel Nicholas to respond to the question.

**{¶ 23}** During the in-chambers discussion, the court and the parties all recognized that the Fifth Amendment was not a proper basis for Nicholas' refusal to answer the question. The debate then turned to whether Belcher was required to address this issue in the form of a Civ.R. 12(C)(3) pretrial motion. Defense counsel insisted that she did not know before trial that the identity of the caller was known to Nicholas and, therefore, was not aware that a pretrial motion was warranted. She argued that because the information provided by the caller put the investigation in motion, the possible motives and the source of the information provided by the caller required exploration. The state, on the other

11.

hand, likened the situation to an anonymous Crimestopper tip where the tipster was unknown, and argued that it was not vital to establishing an element of the crimes and was not helpful in Belcher's defense.

{¶ 24} The trial court first denied the defense motion based on the failure to raise it in a pretrial motion. The court ultimately elaborated the next day on its reasons for denying the motion. It emphasized that the information provided by the caller was not used to arrest him. It agreed with the state that it was merely a tip that provided direction to the investigation and resulted in the discovery that Belcher had outstanding warrants. It concluded that the caller was not a witness or an accuser whom Belcher had a right to confront.

{¶ 25} The Supreme Court of Ohio has held that the identity of a confidential informant must be revealed where his or her testimony is vital to establishing an element of the crime, or would be helpful or beneficial in preparing a defense to criminal charges. *State v. Williams*, 4 Ohio St.3d 74, 446 N.E.2d 779 (1983), syllabus. The burden is on the defendant to establish the need to learn the informant's identity. *State v. Payne*, 6th Dist. Lucas No. L-04-0118, 2005-Ohio-7043, ¶ 41, citing *State v. Parsons*, 64 Ohio App.3d 63, 69, 580 N.E.2d 800 (4th Dist.1989). Disclosure is not required, however, "where the informant did not actively participate in the criminal activity, or where the informant's role is that of a mere tipster." (Internal citations omitted.) *Id.* A trial court's decision regarding the disclosure of the identity of a confidential informant will not be reversed absent an abuse of discretion. *Id.* at ¶ 38*, citing *State v. Elersic,* 11th Dist. Lake

12.

Nos. 2000-L-062 and 2000-L-164, 2001 WL 1497192 *6 (Nov. 21, 2001). An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 26} Setting aside the issue of whether the police report put defense counsel on notice that a pretrial motion was warranted, we find that under the facts of this case, the trial court did not abuse its discretion. Regardless of the fact that the caller provided information to the victim instead of directly to the police, the informant acted merely as a tipster. "Neither the informant's identity nor his testimony was necessary to establish probable cause for obtaining the warrant." *Payne* at ¶ 45. To the contrary, the tip simply provided a lead. Acting on this lead, the detectives were able to determine that Belcher had outstanding arrest warrants, which then led to a legal arrest and to the legal seizure of the Adidas shoes. It also provided the detectives with the information needed to assemble a photo array which enabled the witnesses to identify Belcher. Ultimately it was the witnesses who identified Belcher—not the caller. Had officers relied on the tip to obtain a warrant or make an arrest, the situation may have been different. But in this case, the caller's identity and motive for providing the information would not have benefited Belcher's defense.

{¶ 27} We find Belcher's third assignment of error not well-taken.

13.

## C. Sufficiency of Evidence

{¶ 28} In his fourth assignment of error, Belcher claims that the evidence was not legally sufficient to support his convictions of aggravated burglary, aggravated robbery, and felonious assault because the state failed to show that he used a deadly weapon in perpetrating the crimes. While he recognizes that courts, including this court, have found that a motor vehicle can serve as a deadly weapon, he argues that Belcher did not attempt to physically strike or push Nicholas as he got into the truck and the state did not show that Belcher knew that Nicholas had jumped onto the running board. He also argues that the state failed to ask Nicholas if he had given consent for Belcher to use the truck or to show that Belcher trespassed onto the property while controlling the deadly weapon.

{¶ 29} A vehicle can be classified as a deadly weapon when used in a manner likely to produce death or great bodily harm. *State v. Gimenez*, 8th Dist. Cuyahoga No. 71190, 1997 WL 547950, *7 (Sept. 4, 1997). *See also State v. Dupuis*, 6th Dist. Lucas No. L-12-1035, 2013-Ohio-2128, ¶ 61. The determination of whether a vehicle has been used in such a manner is a question of fact for the trier of fact. *State v. Hutchins*, 6th Dist. Lucas No. L 90-182, 1991 WL 154064, *3 (Aug. 9, 1991). The intent of the user, manner of use, and actions of the user are among the factors that must be examined. *Giminez* at *7.

{¶ 30} In the present case, we agree with Belcher that for purposes of the aggravated burglary charge, the truck did not constitute a "deadly weapon." Although it

may have been used as such in committing the aggravated robbery, Belcher did not enter the garage with a deadly weapon on or about his person or under his control.

{¶ 31} In addition to the failure of the state to prove the "deadly weapon" element of aggravated burglary, we find that it also failed to establish the "by force, stealth, or deception" element.

{¶ 32} R.C. 2911.11(A) provides that:

No person, *by force, stealth, or deception*, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:

* * *

(2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control. (Emphasis added.)

{¶ 33} In *State v. Harris,* 6th Dist. Lucas No. L-06-1402, 2008-Ohio-6168, we discussed the "by force, stealth, or deception" element of R.C. 2911.11(A). We acknowledged that "stealth" has been defined as "any secret, sly, or clandestine act to avoid discovery and to gain entrance into or to remain within a residence of another

without permission." (Internal citations and quotations omitted.) *Id.* at ¶ 94.

"Deception" as defined in R.C. 2913.01(A) is:

> [K]nowingly deceiving another or causing another to be deceived by
> any false or misleading representation by withholding information, by
> preventing another from acquiring information, or by any other conduct,
> act, or omission that creates, confirms, or perpetuates a false impression in
> another, including a false impression as to law, value, state of mind, or
> other objective or subjective fact.

We ultimately held that where the defendant drove directly up a driveway in the daylight and ran into an open, attached garage without trying to avoid detection and without deceiving anyone, the "by force, stealth, or deception" element was not established. *See also State v. Pullen,* 2d Dist. Greene No. 91CA33, 1992 WL 142271, *2 (June 25, 1992).

{¶ 34} We must reach the same conclusion here. According to the witnesses' testimony, Belcher allegedly walked down the street, greeted three men playing football in the street, and walked into an open attached garage during the afternoon while it was still light. The state has failed to establish that he entered by force, stealth, or deception, thus the evidence was not legally sufficient to establish a violation of R.C. 2911.11(A)(2).

{¶ 35} Addressing the other arguments raised by Belcher, while the state did not specifically ask Nicholas whether he gave consent to Belcher to use the vehicle, Nicholas' testimony made clear that he did not. We also find no merit to the argument

16.

that Belcher did not know that Nicholas was on the running board. If he did not initially realize it before putting the truck into gear, he certainly must have quickly realized it as he pulled out and Nicholas was still inches from him at the driver-side window.

{¶ 36} Although we are not persuaded that the state failed to present legally sufficient evidence establishing the "deadly weapon" element as it relates to the aggravated robbery and felonious assault convictions, we nonetheless conclude that the state did not provide evidence going to each element of the aggravated burglary charge, R.C. 2911.11(A)(2).

{¶ 37} We find Belcher's fourth assignment of error well-taken, in part, and not well-taken, in part.

### D. Manifest Weight of the Evidence

{¶ 38} Belcher also challenges his convictions as being against the manifest weight of the evidence. He argues that the charges against him were not proven beyond a reasonable doubt because the only witness to the crime was Nicholas, who he claims was biased and could not reliably identify the suspect during the stress of the event. He also challenges the conviction because he claims the anonymous caller was biased.

{¶ 39} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78

17.

Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 40} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Myers*, 6th Dist. Wood No. WD-13-048, 2014-Ohio-3759, ¶26.

{¶ 41} Here, Lowell and Allen testified that they were 100% certain that Belcher was the person they saw walk by just before the incident occurred. Moreover, Nicholas was certain that it was Belcher he saw in his truck that afternoon. Nicholas denied knowing Belcher before the incident. The jury had the opportunity to take into account the potential for bias and to consider the reliability of the witness identifications in light of the stress of the event. We cannot say here that the jury lost its way in making its credibility determinations.

18.

**{¶ 42}** We find Belcher's fifth assignment of error not well-taken.

### E. Merger

**{¶ 43}** In his sixth assignment of error, Belcher claims that the trial court erred in not merging his felonious assault and aggravated burglary or aggravated robbery convictions for purposes of sentencing. Because we have determined that the aggravated burglary conviction cannot stand, we determine only whether the felonious assault and aggravated robbery charges required merger.

**{¶ 44}** The Ohio Supreme Court in *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 48, established a two-step test to determine whether offenses are allied offenses of similar import under R.C. 2941.25(A). First, we must examine "whether it is possible to commit one offense *and* commit the other with the same conduct." If the answer is yes, we must then determine "whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* at ¶ 49, quoting *State v. Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 50 (Lanzinger, J., dissenting). We apply a de novo standard of review in making that determination. *State v. Williams,* 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 30.

**{¶ 45}** Concerning the first step, we have recognized that it is possible to commit both offenses with the same conduct. *State v. Pope*, 6th Dist. Lucas No. 12-1168, 2013-Ohio-4091, ¶ 21. We must, therefore, ascertain whether the offenses in this case actually were committed by the same conduct.

19.

**{¶ 46}** Whether two offenses are allied depends not only on whether the two crimes were committed in the same act, but also with a single state of mind. *State v. Bailey*, 8th Dist. Cuyahoga No. 100993, 2014-Ohio-4684, ¶ 34. In determining whether two offenses were committed with a single state of mind, the court must consider "(1) whether the first offense was merely incidental to the second offense or whether the defendant's conduct in the first offense demonstrated a significance independent of the second, and (2) whether the defendant's conduct in the first offense subjected the victim to a substantial increase in the risk of harm apart from that involved in the second offense." *Id.* at ¶ 35, citing *State v. Shields,* 1st Dist. Hamilton No. C-1003 62, 2011-Ohio-1912, ¶ 17.

**{¶ 47}** Belcher argues that the act of moving the truck with the victim on the running board occurred as part of the theft. The state argues that Belcher used the truck to attempt to dislodge Nicholas from the running board and that he deliberately scraped the truck against Nicholas' wife's car. In deciding not to merge the offenses, the trial court reasoned that if Belcher had not chosen to back out of the garage at a high rate of speed, the felonious assault would not have occurred. We reach a different conclusion.

**{¶ 48}** The use of the "deadly weapon" here—i.e., the truck—was incidental to Belcher backing the vehicle out of the garage to steal it. There was no evidence presented indicating that Belcher tried to fling Nicholas from the car. To the contrary, it appears that the collision with Nicholas' wife's car and the wall of the garage resulted merely from a hurried and haphazard attempt to remove the truck from the garage. There

20.

was no separate animus established.  We, therefore, find that the aggravated robbery and felonious assault convictions should have merged.

{¶ 49} We, therefore, find Belcher's sixth assignment of error well-taken.

## F.  Consecutive Sentencing

{¶ 50} In his seventh assignment of error, Belcher argues that the trial court erred in failing to make statutory findings before ordering that his sentence on the felonious assault conviction run consecutively with his sentences on the aggravated robbery and aggravated burglary convictions.  Because we previously concluded that his conviction for aggravated burglary cannot stand and that his felonious assault conviction should have merged with the aggravated robbery conviction for sentencing purposes, his seventh assignment of error is rendered moot.

## III.  Conclusion

{¶ 51} We find Belcher's first, second, third, and fifth assignments of error not well-taken.  We find his fourth assignment of error well-taken, in part, and not well-taken, in part, and we find his sixth assignment of error well-taken.  Our decision renders his seventh assignment of error moot.  We, therefore, vacate Belcher's conviction for aggravated burglary, and further reverse the October 11, 2013 judgment of the Lucas County Court of Common Pleas, in part, and remand to the trial court for proceedings consistent with this decision.  The state is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.    _____
               JUDGE

Arlene Singer, J.

            _____

James D. Jensen, J.        JUDGE
CONCUR.

            _____

               JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.